WEBB, JUDGE:
*485 An application of the claimant, Michael N. Wingett, for an award under the West Virginia Crime Victims Compensation Act, was filed October 14,1998. The report of the Claim Investigator, filed June 18,1999, recommended that no award be granted, to which the claimant timely objected. An Order was issued on March 29, 2000, confirming the Investigator's recommendation, in response to which the claimant's request for hearing was filed April 18, 2000. This matter came on for hearing de novo January 17, 2001, the claimant appearing in person, and the State of West Virginia by counsel, Joy M. Bolling, Assistant Attorney General.
The 24-year-old claimant was a victim of criminal conduct in Dunbar, Kanawha County, on or about August 3,1998. The claimant testified that he had started a new job that day and had worked for twelve hours. He was walking home at approximately 7:30 p.m., when he was approached by two men on the sidewalk. As they passed each other on the street, they braised (sic) him. Claimant testified that he had never seen the men before, that no words were exchanged, and that no fighting occurred. (Transcript, p ages 5-6.) C laimant testified that between 7:30 and 9:30 p.m., he was at a friend’s house and that he had consumed approximately two or three beers. However, later in the hearing, the claimant testified that he may have had three or four beers. (Transcript, page 16.)
The claimant apparently then walked from the convenience store to his friend’s house. On his way home, he stopped at the Dunbar Convenient Mart again. At this time, the claimant testified that Emily Amend ran into the store and said to him that there were two guys outside who wanted to kill him. (Transcript, page 6.) It is the claimant’s testimony that when he walked out of the Dunbar Convenient Mart, Christopher Scott Adkins and James Cook approached him. Christopher Scott Adkins acted as though he wanted to fight. Claimant testified that he did not wish to fight either Christopher Adkins or James Cook. Claimant asserts that when he then turned his back on the two men, Christopher Scott Adkins stabbed him in the back with a large knife. (Transcript, page 6.) The claimant fell to the ground. He does not recall anything after collapsing until he was at the hospital.
It is not disputed that the claimant suffered near-fatal injuries, including collapsed lungs, serious infections, a great loss of blood, and obvious pain and suffering. He spent twenty-five days at Charleston Area Medical Center and has permanent scarring as a result of this vicious attack.
By Order issued June 18, 1999, this claim was denied on the basis that at the time of the writing of the original Finding of Fact and Recommendation there was no record of the incident being reported to the police, which is required under W. Va. Code §14-2A-14(b). On March 17, 2000, the Kanawha County Prosecuting Attorney provided a copy of the police report, made part of the record in this claim. The report indicates that the crime had in fact been timely reported, and also provided the court record revealing that the offender was arrested for malicious wounding and was *486 subsequently convicted of unlawful wounding of the claimant. Therefore, this claim is not being denied on this ground.
However, this Court does adopt the Claim Investigator’s recommendation as stated in his memo to the Chief Deputy Clerk dated March 21, 2000, that this claim be denied. The Investigator’s denial was based upon the fact that the claimant was not an innocent victim of crime because he was intoxicated and had entered into mutual combat. The Court also finds that the claimant was guilty of contributory misconduct. Nothing adduced at the hearing convinces this Court-otherwise.
W. Va. Code §14-2A-3(1) defines “Contributory misconduct” as:
“any conduct of the claimant, or of the victim through whom the claimant claims an award, that is unlawful or intentionally tortious and that, without regard to the conduct’s proximity in time or space to the criminally injurious conduct has causal relationship to the criminally injurious conduct that is the basis of the claim and shall also include the voluntary intoxication of the claimant, either by the consumption of alcohol or the use of any controlled substance when the intoxication has a causal connection or relationship to the injury sustained.”
Furthermore, W. Va. Code §14-2A-14 provides the Court with the discretion to deny or modify an award based upon the contributory misconduct of the claimant or the victim through whom a claim is made. Therefore, when a claimant’s actions fall without the express wording of contributory misconduct as defined in W. Va. Code § 14-2 A-3 (1), the Court will then look to the purpose and intent of the Act. The Act established a system of compensation for innocent citizens who are victims of crime. While misconduct includes unlawful conduct as a matter of law, “misconduct” may be something less than unlawful conduct, though more than an act in poor taste. Misconduct requires some deviation from the accepted norm or standard of proper behavior. Conduct may be construed as “Contributory Misconduct” if an ordinary prudent person could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all the facts as they existed. In re Trador, CV-97-56 (1997). The proximate cause does not require that the claimant should have been able to foresee the injury in the precise manner in which it actually occurred, but only that consequences of a generally injurious nature were probable under all the facts.
In this claim, it is evident from the claimant’s medical records that he was intoxicated. The claimant’s blood alcohol level content was .20%. This is twice what the legal limit would be if claimant were driving a vehicle. Furthermore, the claimant testified that at the time of this incident he weighed only one hundred forty pounds, and that he had drunk no more than four beers. (Transcript, page 16.) According to the claimant’s own testimony, these beers were consumed in less than a two-hour period, between 7:30 p.m. and 9:30 p.m., the approximate time of this incident. (Transcript, page 15.) The claimant’s brother, Kevin Alan Wingett, also made a recorded statement to Officer W.S. Lucas of the Dunbar Police Department *487 that everyone was drinking that day, and that “I was about the only sober one there that night, you know.” Claimant also tested positive for marijuana. Although he testified that he had not smoked marijuana for more than two weeks and that he was trying to quit because his new employer was going to do drug testing, this Court must take into consideration that this testimony from the claimant may be self-serving. (Transcript, page 16.)
Although intoxication is not an absolute bar to an award, where there is a causal connection between the intoxication and the injury sustained, the claimant is not an innocent victim. In this claim, the claimant’s intoxication does appear to have had a causal connection to his injuries. It is highly probable that his intoxication did cloud his judgment in this incident, especially when he left the Dunbar Convenience Mart, after he had been told that there were two guys outside who wanted to kill him Regardless of whether or not the claimant’s intoxication clouded his judgement, his decision to leave the store after being told that there were two people outside who wanted to kill him was not the action of a reasonably prudent person. A reasonably prudent person would not place himself in that situation, especially given the fact that he had had an earlier confrontation with the two men who were outside the store, who had threatened to kill him. It is reasonably foreseeable that some form of harm would result under those circumstances.
Claimant testified that he did not know that the threat to kill him was made by the same two men with whom he had had an earlier confrontation. However, his own testimony contradicts this assertion as does his recorded statement to the investigating officer, Officer W.S. Lucas of the Dunbar Police Department, on August 31, 1998. Claimant made the following statement to Officer Lucas: “I went on ahead and went home and then uh-went up to the store right beside my house to get some cigarettes and was there about five minutes a girl come in there and said that there was two guys out there that was wanting to kill me. When I looked outside it was the same two guys that was out there so I just proceeded down to my house and they confronted me at the-in front of my driveway and I thought we were going to fight again.” On cross-examination, the claimant was asked if he became concerned upon being told that two guys wanted to kill him. His answer was very unclear at best. He stated, “I wasn’t really concerned about it because they was a couple houses down and I just seen that it was the two guys that I’d had — there wasn’t a run-in, no words was said, no punches was thrown.” (Transcript, page 10.) This response indicates, especially with the claimant’s hesitation in his testimony, that he did know that the same two men he had a confrontation with earlier were outside and had made the threat to kill him. The claimant’s mother, Linda Wingett, also made a recorded statement to Officer Lucas that contradicts the claimant’s testimony that he had not had a confrontation or an earlier “run-in” with the two men. She stated that she knew that there was a first incident as Jeny Wingett and Michael Wingett were walking on the sidewalk. She said they bypassed the two other men *488 and that the “tallest guy had pushed Mike and then just kind of provoked him, maybe you want a piece of me, you know, come on let’s fight.”
Clearly, these are not the actions of a prudent person. Even if the Court were to adopt the claimant's testimony that he did not know that the two men waiting outside were the same two men whom he had encountered before, and that they had not really had a real confrontation earlier on the sidewalk, a prudent person would not have left the relative safety of the convenience store. A prudent person would have called the police and taken some form of precautionary measures for his own safety.
Finally, one of the most important statements made to Officer Lucas was that of Joseph Daniel Snyder, a friend and apparent distant relative of the claimants. Mr. Snyder stated that he witnessed Michael Wingett and "the guy with no shirt on fighting and that Mike had him down and then a boy, the other guy come up behind him and then hit him in the back." Mr. Snyder also stated that "it looked like Mike was beating the hell out of him at first, you know, I mean, he was (sic) they started fighting and Mike just went crazy on them, you know.”
It is the law of this State that one has a duty to retreat, if such a path is available, before resorting to physical force. In re Schunn, CV-89-112 (1991). The evidence presented in this case and the police report indicate that the claimant had an opportunity to avoid this conflict and may have engaged in mutual combat. This by no means justifies the vicious conduct of Christopher Scott Adkins. However, it does constitute contributory misconduct and bars claimant from any award.
The Court is constrained by the evidence to stand by its previous ruling, and deny the claim.
Claim denied.